(73 P.3d 149)
No. 88,249

GEORGE D. WORLEY, *Appellee*, v. BRADFORD POINTE
APARTMENTS, INC., d/b/a BRADFORD POINTE APARTMENTS,
*Appellant*.

Opinion filed July 18, 2003.

*Mike O'Neal*, of Gilliland & Hayes, P.A., of Hutchinson, for appellant.

*Daniel J. Strausbaugh*, of Strausbaugh & Tongier, L.L.C., of Overland Park, for appellee.

Before KNUDSON, P.J., BEIER and MALONE, JJ.

MALONE, J.: Bradford Pointe Apartments, Inc. (BPA) appeals the trial court's denial of its motion for directed verdict and the refusal to give BPA's requested jury instruction. This is a slip and fall case tried to a jury. The issue is whether the rule of law in *Agnew v. Dillons, Inc.*, 16 Kan. App. 2d 298, 822 P.2d 1049 (1991), as applied to the facts of this case, required a directed verdict for the defendant, or at least required the court to give the defendant's requested jury instruction.

BPA leases luxury apartments in Olathe, Kansas. It advertised itself as being "the ultimate living experience" and "Kansas City's finest gated and fenced apartment complex." Base rent is listed as $1,150 per month, with various amenities offered at higher rates. Arrangements for snow and ice removal are not included in the lease agreement. However, BPA distributed a bulletin and a letter to all residents prior to the winter of 1998. The headline on the bulletin read, "Let it Snow." The bulletin and letter assured the tenants that BPA would put salt down whenever needed in order to treat icy conditions.

On Sunday, December 20, 1998, George Worley slipped and fell after exiting his apartment at the BPA complex. On the day of the fall, the weather station at Johnson County Executive Airport reported that temperatures were below freezing all day. The weather station also reported that a freezing drizzle began to fall in Olathe at 9:53 a.m. Worley testified that he noticed a light rain or sleet had been falling "on and off" throughout the day. However, Worley claimed that it was not sleeting when he left his apartment at 3 p.m.

However, when Worley exited his apartment he immediately noticed that it had previously been sleeting and the sidewalk was icy. Worley acknowledged that he slipped on the icy sidewalk and sustained injury. No other explanation for Worley's fall was provided at trial.

Victor Howard, who was visiting his girlfriend, Melissa Hall, at BPA, witnessed Worley's fall and testified that freezing drizzle had been falling from 9:30 a.m. that day. Howard noticed that the sidewalks and parking lot had become "very slick" by 10:30 a.m. Furthermore, Howard testified that Hall made at least three phone calls to the apartment complex to report the ice. Hall never received a response or actually talked with a BPA employee, but she testified that she left at least four messages regarding the icy conditions throughout the day.

Eileen Finch, a leasing consultant at BPA, rebutted the testimony of Howard and Hall when she testified that no ice was accumulating at BPA during the afternoon hours of December 20, 1998. She testified that the weather conditions were not bad while she was at work from 12 p.m. to 5 p.m. that day. She also testified that she received no phone calls from tenants asking for treatment of snow or ice.

Rick Oddo, the president of BPA, testified that only a drizzle was falling during the afternoon hours of December 20, 1998. Oddo also testified that the surface conditions were fine when he drove through the complex during the late afternoon. However, at around 5:30 p.m., Oddo acknowledged that a car slid on the ice and crashed into pillars near the front entrance of the complex.

The streets of BPA were not salted or sanded until 5:45 p.m. on December 20, 1998. BPA did not begin salting the sidewalks on the premises until the next day.

Robert Rohman, who had 32 years of snow and ice removal experience, testified as an expert witness for Worley. Rohman testified that it was not his practice to wait for a storm to conclude before treating icy conditions. However, he also stated that, depending upon the amount of precipitation falling, there is no guarantee that a treated area will remain free of ice 2 hours after an application is made.

At the start of trial, a list of admissions made by BPA was read to the jury. These admissions included the following:

"It is admitted by the defense that ice removal was included as a part of the services provided to tenants at Bradford Pointe Apartments.

"It is admitted that the cost of removing ice is a part of the rent paid by the tenants at Bradford Pointe Apartments.

. . . .

"It is admitted that the owners of Bradford Pointe Apartments expected if a call came in from a tenant during the day on a Sunday requesting treatment of ice on sidewalks and driveways, that there would be a response within an hour."

Furthermore, BPA admitted that if a request for treatment of ice went unresponded to for 2 hours, it would be against BPA policy. BPA acknowledged other uncontroverted facts in its reply brief filed for a summary judgment motion, including the following statement: "6. It is uncontroverted that it was the practice of Bradford Pointe Apartments to salt the streets at the first sign of snow or ice and continue as needed."

In BPA's summary judgment motion, it argued that the doctrine expressed by this court in *Agnew* required a finding of no fault for BPA as a matter of law. Specifically, BPA argued that the "winter storm" doctrine, as expressed in *Agnew*, allows BPA to wait until the conclusion of a winter storm and a "reasonable time thereafter" before the failure to remove ice from outdoor surfaces could be considered a breach of duty. The trial court determined that fact issues precluded summary judgment and denied the motion.

At the conclusion of the evidence at trial, BPA moved for a directed verdict or judgment as a matter of law on the same issue addressed in the summary judgment motion. In the alternative, BPA submitted a proposed instruction to explain to the jury the law of the *Agnew* case. The trial court denied BPA's motion and also failed to include BPA's proposed jury instruction. Pressed for time, the trial court did not give the parties an opportunity to argue the motion and the instructions until after the jury was deliberating. Once the parties were allowed to make arguments for the record, the trial court stated that it denied BPA's requests because, after hearing the evidence, it believed the case was not an *Agnew* case. The court reasoned that the evidence presented an intermittent storm rather than a continuous storm.

The jury returned a verdict finding BPA to be 51% at fault and Worley to be 49% at fault. BPA timely appeals from the journal entry of judgment.

BPA first claims that the trial court erred when it decided to schedule arguments on the motion for directed verdict and proposed jury instructions after the jury had already begun deliberations. A trial court has the discretion to hear arguments after the jury has begun deliberations in order to preserve the record on appeal. *Graham v. Loper Electric Co.*, 192 Kan. 558, Syl. ¶ 3, 389 P.2d 750 (1964). Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. *State v. Lumley.* 266 Kan. 939, 950, 976 P.2d 486 (1999).

BPA acknowledges that the motion for directed verdict was essentially a continuation of the earlier summary judgment motion addressing the law of *Agnew.* Therefore, the trial court was well aware of the legal issue and had previously decided that the facts of the case did not support a verdict for BPA as a matter of law. It is unclear how BPA was prejudiced by the trial court's decision to postpone arguments until after the jury began deliberations. Had the trial court decided to change its mind and grant a directed verdict based on *Agnew*, it certainly could have made that decision regardless of the jury's deliberations.

BPA also argues that it was error to deny it the opportunity to make an argument regarding its proposed *Agnew* instruction prior to the jury's deliberations. However, the court made it clear that it would allow BPA to make a record of its objection after the jury was given the case, and it would consider the objection to have been given in a timely fashion. At no time was BPA in jeopardy of being prevented from preserving the record.

Worley correctly cites this court to *Graham*, 192 Kan. 558, Syl. ¶ 3, where it was held: "[T]he trial court did not err . . . in delaying the making of a record of objections to instructions until after the jury was charged, nor in the instructions given." BPA attempts to distinguish *Graham* by claiming that the legal issues in that case had been argued numerous times, while in the present case, "there had been no prior discussion or argument regarding defendant's proposed *Agnew v. Dillons* instruction." Although the instruction had not been previously argued, the legal principle of *Agnew* and its application to the facts of the case had been argued within BPA's summary judgment motion which was denied by the

court. The arguments regarding *Agnew* were well known to the court by the close of evidence. Furthermore, the trial court stated that it had reviewed the proposed instruction and had decided it did not apply.

BPA's only support for its position comes from *Dickinson v. Beal*, 10 Kan. App. 233, 62 Pac. 724 (1900). In *Dickinson*, the court held that parties have a right to be heard on questions of law even where a judge has a well-defined opinion on the subject. However, in the present case, the court did not refuse to hear BPA's argument on the instruction; the court only delayed argument until the jury was deliberating.

In summary, BPA was not prejudiced by the decision of the trial court to postpone arguments until after the jury began delibera- tions. At no time was BPA in jeopardy of being prevented from preserving the record. The trial court did not abuse its discretion by its procedure.

Next, BPA challenges the trial court's refusal to direct a verdict in its favor at the close of evidence.

"In ruling on a motion for directed verdict . . ., the court is required to resolve all facts and inferences to be drawn from the evidence in favor of the party against whom the ruling is sought and, where reasonable minds could reach different conclusions based on the evidence, the motion must be denied and the matter submitted to the jury. This rule must also be applied when appellate review is sought on a motion for directed verdict. [Citation omitted.]" *Reeves v. Carlson*, 266 Kan. 310, 313, 969 P.2d 252 (1998).

As in the summary judgment motion, BPA argues that the "win- ter storm" doctrine as expressed in *Agnew* relieves BPA from any liability for Worley's fall as a matter of law. In *Agnew*, an ice storm was in progress and ice was accumulating in front of a Dillons grocery store at the time plaintiff entered the store. The plaintiff was exiting Dillons when he slipped on a mat leading into the store. The trial court granted a directed verdict in favor of Dillons on the issue of liability. On review, the Kansas Court of Appeals held:

"A business proprietor, absent unusual circumstances, may await the end of a winter storm and a reasonable time thereafter to remove ice and snow from out- door entrance walks, platforms, or steps because it is impractical to take action earlier." 16 Kan. App. 2d 298, Syl. ¶ 2.

The *Agnew* court reasoned that requiring a business proprietor to continually expend effort during a winter storm to remove precipitation from outdoor surfaces would essentially be a requirement to insure the safety of invitees and is a burden which is beyond that of ordinary care. Interestingly, the *Agnew* court remanded the case for a new trial due to the trial court's failure to allow evidence of the lack of a handrail at the Dillons' entrance.

The Kansas Supreme Court adopted the *Agnew* "winter storm" doctrine in *Jones v. Hansen*, 254 Kan. 499, Syl. ¶ 5, 867 P.2d 303 (1994). The court ruled that *Agnew* is supported by sound public policy and applied the doctrine to licensees and invitees alike. 254 Kan. at 510-11.

Although *Agnew* is clearly the law in Kansas, there are numerous factual differences which distinguish this case from *Agnew*. This case involves a tenant slipping in a common area of his residential apartment complex rather than a customer slipping in front of a retail grocery store. This distinction alone is not controlling as *Agnew* may apply to a landlord-tenant relationship under certain circumstances. However, BPA made numerous promises and representations to its tenants affecting the duty owed by BPA to its tenants during inclement weather. BPA voluntarily assumed the duty to provide fast and effective ice removal to its tenants and used this as a selling point for its apartments. It admitted that the cost of the snow and ice removal was a part of the rent paid by tenants. BPA also admitted that it expected ice to be treated by its maintenance crew within 1 hour of receiving a phone call from a tenant. BPA distributed a bulletin and a letter assuring all tenants that BPA would apply salt whenever needed in order to treat icy conditions.

Furthermore, the nature and extent of the "storm" in this case was called into question by several witnesses. BPA's own witnesses testified that the storm might not have even started at the time of Worley's fall. Oddo testified that it was only drizzling and the surface conditions at BPA were fine when he drove through the complex in the late afternoon. Finch testified that the weather conditions were not bad other than a little fog and drizzling rain while

she was at work from 12 p.m. to 5 p.m. In *Agnew*, it was undisputed that a "winter storm" had actually begun at the time of the fall.

Therefore, the trial court was presented with conflicting testimony regarding the weather conditions as well as evidence tending to show that BPA had voluntarily assumed a responsibility for clearing ice and snow even while a storm was in progress. This case was much different than *Agnew*. There were significant factual disputes on the issue of fault. At the close of the evidence, and resolving all facts and inferences in favor of Worley, the trial court could not have granted BPA's motion for directed verdict.

Finally, BPA argues that the trial court erred in failing to provide an "*Agnew* instruction" to the jury.

A trial court is required to properly instruct the jury on a party's theory of the case. *Wood v. Groh*, 269 Kan. 420, 423, 7 P.3d 1163 (2000). When reviewing challenges to jury instructions, this court is required to consider all the instructions together, read as a whole, and not to isolate any one instruction. If the instructions properly and fairly state the law as applied to the facts of the case, and a jury could not reasonably have been misled by them, the instructions do not constitute reversible error even if they are in some way erroneous. *State v. Mitchell*, 269 Kan. 349, 355, 7 P.3d 1135 (2000).

BPA argues that PIK Civ. 3d 126.31 should have been modified to incorporate the holding from *Agnew*. The instruction given to the jury reads:

"A landlord who leases parts of its premises to different tenants and expressly or impliedly reserves other parts thereof, such as entrances and walks, for the common use of different tenants, has a duty to exercise ordinary care to keep in a safe condition such reserved parts for use in the manner and for the purpose intended."

The jury was also instructed:

"Negligence is the lack of ordinary care. It is the failure of a person to do something that an ordinary person would do, or the act of a person in doing something that an ordinary person would not do, measured by all the circumstances then existing."

BPA's purposed instruction read:

"Absent unusual circumstances, a landlord does not breach the duty of ordinary care owed to tenants to keep premises in a reasonably safe condition by not removing accumulated precipitation from exterior surfaces during a winter storm and a reasonable time thereafter."

As discussed, there are numerous factual differences between *Agnew* and the present case. Ultimately, the jury here was instructed to apply the "ordinary care" standard to the evidence presented in the case. BPA acknowledges that it was allowed to argue its version of the facts to the jury. It was permitted to argue that due to the circumstances of the ongoing storm, it was unreasonable to expect BPA to salt the sidewalks until a reasonable time thereafter. The jury was allowed to consider this argument in determining whether BPA exercised ordinary care under the circumstances.

Given the factual differences between the present case and *Agnew*, it does not appear that the trial court abused its discretion when it refused to give BPA's proposed instruction. The instruction which was given fairly and accurately stated the law as it applies to landlord-tenant relationships. The trial court *could have* given an instruction to the jury concerning the legal principle of *Agnew*. However, we do not believe the trial court committed reversible error by failing to give such an instruction in this case.

Finally, even if the trial court should have given an *Agnew* instruction, we question whether BPA's proposed instruction was sufficient. To instruct the jury to determine the meaning of "absent unusual circumstances," without any further guidance or explanation, possibly would have been more confusing than helpful for the jury.

Affirmed.